In June 2000, Barbara Rubley, in her individual capacity and as guardian and next friend of Crystal Rubley, a minor child, sued the Pittsburg Midway Coal Mining Company ("the company") in the Walker Circuit Court, seeking benefits under the Alabama Workers' Compensation Act ("the Act"). In that complaint, Barbara Rubley and Crystal Rubley alleged that on July 22, 1999, Albert Franklin Rubley ("the worker"), who was Barbara Rubley's husband and Crystal Rubley's father, suffered a brain injury arising out of and in the course of his employment by the company and had died as a result of that injury. On the company's motion, the case was transferred to the Tuscaloosa Circuit Court, and the company filed an answer denying that the worker had been injured in a workplace accident. After an ore tenus proceeding, the trial court, on June 5, 2001, entered a judgment in favor of Barbara Rubley and Crystal Rubley and awarded them compensation pursuant to § 25-5-60, Ala. Code 1975, a portion of the Act.[1] The company filed a notice of appeal on July 12, 2001.
The standard of review in a workers' compensation case was stated by our supreme *Page 337 
court in Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala. 1996):
 "[W]e will not reverse the trial court's finding of fact if that finding is supported by substantial evidence — if that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
680 So.2d at 268-69 (quoting West v. Founders Life Assur. Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989)). However, "an appellate court's review of the proof and [its] consideration of other legal issues in a workers' compensation case shall be without a presumption of correctness." Ex parte American Color Graphics,Inc., 838 So.2d 385, 387-88 (Ala. 2002) (citing Ala. Code 1975, §25-5-81(e)(1)).
The record reveals the following pertinent facts. The worker, who was 53 years old at the time of his death, worked as a coal miner on the company's middle work shift (i.e., approximately 2:00 p.m. to 10:00 p.m.). Among the worker's duties were maintaining and operating a conveyor belt in a lower pocket of an underground coal mine. To access his workplace, the worker would be lowered by an elevator into an upper mine pocket and then would have to descend approximately 8 flights of stairs, each containing about 10 steps composed of grated steel. Likewise, to leave his workplace, the worker would climb the steps to exit the lower pocket and take the elevator out of the upper pocket.
Before July 22, 1999, the worker had suffered only one injury at his workplace, a knee injury in 1997 from which the worker had recovered sufficiently so as to resume work. However, the worker was not in perfect health. The record reveals that the worker was afflicted with diabetes mellitus, which required his blood sugar to be monitored to ensure that it was an appropriate level. The worker also had a history of hypertension, gout, headaches, backaches, and neckaches, as well as impaired liver functioning arising from abuse of alcohol. However, these conditions did not prevent the worker from regularly performing his work duties.
At some point during a family vacation that lasted until July 17, 1999, the worker suffered a fall while on a swimming excursion to a former strip-mining pit. During that vacation, the worker chose to stop his alcohol intake; before that time, the worker typically had drunk either a "six-pack" of beer or a pint of rum each day. Although the worker was scheduled to return to work on Monday, July 19, 1999, he took that Monday off from work because of back pain and neck stiffness, but he returned to work on the following day. In addition, the worker consulted a chiropractor on July 21, 1999, regarding neck and back pain, although he worked his full shift that day.
While at home on the morning of July 22, 1999, a Thursday, the worker's blood sugar dropped to a level between 30 and 49, a level that is considered below normal; the worker complained of dizziness, and he exhibited some confusion. The worker's adult son, who worked as an emergency-room nurse, testified that the worker "should have [gone] to the hospital [to] be checked out," but the worker's dizziness abated after he ingested glucose and a carbonated beverage. The worker then consumed a regular lunchtime meal and went to work.
Upon arrival at the mine, the worker spoke with Johnny Willis, a worker in the upper mine pocket; the worker commented that he was experiencing neck pain, but otherwise did not relate anything that Willis considered unusual. However, just after beginning his work shift, the worker sat down on a bench next to Leland *Page 338 
Blanton, a mine examiner who had known the worker for years; the worker did not speak for between 5 and 10 minutes, prompting Blanton to ask Willis whether anything was wrong.
After descending to his work station, where he worked alone, the worker communicated by an internal intercom, or "mine phone," with Willis on two occasions during his shift, at approximately 5:30 p.m. (when the worker requested the temporary removal of an electrical circuit breaker) and 9:25 p.m. (when Willis asked the worker to add water to a conveyor transfer belt to reduce friction). Willis reported that the worker typically had left his work station by 9:25 p.m., although Willis opined that the worker had seemed normal based on their interaction over the mine phone.
Two coworkers who actually saw the worker at his work station in the lower mine pocket during his shift testified that the worker may not have been feeling well. A roving worker named Earl Wayne Holmes testified that he had talked with the worker at 4:30 p.m. and had seen him again at 7:00 p.m.; Holmes opined that the worker had "looked like he was a little bit pale." Wayne Kimbrell, who worked at the worker's work station on the night shift, testified that he had relieved the worker at his work station at 9:50 p.m., which was somewhat unusual because by that time on most workdays, the worker typically had ascended the steps and had temporarily relieved the "top man." Kimbrell testified that he had encountered the worker sitting on a bench looking "pale . . . like he had been up a long time." When the worker struggled to rise from the bench, Kimbrell asked if the worker was all right; the worker replied that he was.
After Kimbrell had turned away for two or three minutes to perform certain work duties, the worker began to climb the stairs leading out of the lower pocket of the mine. However, when Kimbrell returned, he noticed that the worker was having difficulty climbing the stairs, forcefully holding the handrail. Kimbrell followed the worker part of the way up the stairs, again asking if the worker was all right; the worker again said that he was all right, adding "[I]t's probably my sugar."
Kimbrell followed the worker up the stairs until he came within four flights of the upper pocket, from which the elevator for the surface embarked. Kimbrell then contacted Clarence Butler, who was working in the upper pocket; Kimbrell informed Butler that the worker was on his way up the stairs and requested that Butler notify him if the worker did not arrive soon. The worker then completed his ascent, and Butler called to the worker; the worker acknowledged Butler by turning towards Butler and waving his hand, and he then walked about 20 feet towards the elevator, at which time he left Butler's sight.[2]
The worker typically arrived at his home at 11:00 p.m. after leaving work; however, on July 22, 1999, he did not do so. At approximately 11:15 p.m., Willy Winston, another mine worker, telephoned the worker's home to ascertain whether the worker had reached home, but was told that the worker had not yet come home. The worker's son traveled to the mine and found another of the worker's coworkers, Phil ("Buck") Buchanan. The two of them *Page 339 
found the worker in the mine's ground-level bathhouse. The worker was found in a stall, talking to himself, half-dressed and with wet hair; the worker was disoriented and recognized neither Buchanan (whom he called by the nickname of another coworker) nor his own son. The worker's son administered glucose paste to the worker under the belief that the worker was suffering a diabetic reaction but that did not alleviate the worker's condition.
The worker was then taken by a company automobile to a hospital emergency room in Northport, where he was diagnosed with bilateral subarachnoid hemorrhages after a CT scan revealed bleeding in the area of his brain. He was then transported by an ambulance to a Bessemer hospital, where he was admitted at 8:30 a.m. on July 23, 1999, and subsequently underwent treatment by Dr. Evan Zeiger, a board-certified neurosurgeon. However, the worker's condition worsened, and he died on July 31, 1999. Dr. Zeiger testified that the most likely ultimate cause of the worker's death was a traumatic brain injury caused by a fall that occurred within 12 hours of the worker's admission to the Bessemer hospital on the morning of July 23, although he considered the proposition that the worker could have lost consciousness and fallen because of a liver condition, alcohol withdrawal, and/or from use of the prescription medicine sildenafil citrate ("Viagra").
Under the Alabama Workers' Compensation Act, "[w]hen . . . death is caused to an employee by an accident arising out of andin the course of [the] employment," and "the actual or lawfully imputed negligence of the employer is the natural and proximate cause" of that death, that worker's personal representative, on behalf of the worker's "surviving spouse and next of kin, shall receive compensation by way of damages therefor from the employer," provided that the worker was not guilty of misconduct. Ala. Code 1975, § 25-5-31 (emphasis added). The necessity of showing negligence, of course, has been eliminated in the great majority of cases by § 25-5-51, Ala. Code 1975, which provides that compensation shall be paid under the Act "in every case of . . . death of [an] employee caused by an accident arising out of and in the course of his or her employment, without regard to any question of negligence." These statutes set forth two necessary elements to recover workers' compensation benefits based upon an alleged work-related death: a claimant must demonstrate that the worker died because of an accident that (1) arose out of, and (2) occurred in the course of, his or her employment.
The company contends on appeal that the trial court "guessed" that the worker had suffered an accident and that that purported accident occurred at work. Such an argument amounts to, in essence, a challenge to the trial court's conclusion that the worker suffered an accident "in the course of" his employment.
However, there was substantial evidence before the trial court indicating that on July 22, 1999, the worker had suffered a low-blood-sugar episode before reporting for work at the mine; that he exhibited errant behavior during his work shift at the mine that day; that he appeared pale while at work; that he could not leave the lower mine pocket that evening without considerable strain; and that he was found in a disoriented state in the mine's bathhouse just over two hours after he was last seen by his coworker walking toward an elevator. Moreover, the worker's son discovered abrasions on the worker's body after he was admitted to the Bessemer hospital, as well as unusual circular marks on the worker's head corresponding to the round inserts in the worker's protective hard hat. The foregoing circumstantial *Page 340 
evidence of a traumatic fall, coupled with Dr. Zeiger's opinion that the worker had suffered a traumatic brain injury from a fall within 12 hours of 8:30 a.m. on July 23, 1999, tends to support a finding that the worker accidentally fell while on the company's premises and thereby suffered an injury "in the course of" his employment, a term that refers to the time, place, and circumstances under which the accident occurred. See Massey v.United States Steel Corp., 264 Ala. 227, 230, 86 So.2d 375, 378
(1956) (injury to worker arises in the course of employment when it occurs within period of employment at a place where the worker may reasonably be and while the worker is reasonably fulfilling employment duties or engaged in doing something incident to it).
However, it remains to be considered whether the trial court could properly have concluded that an accident occurred that "arose out of" the employment of the worker. In order for an injury or a death to be said to "arise out of" employment, "there must be `a causal relationship between the injury and the employment.'" Wal-Mart Stores, Inc. v. Morgan, 830 So.2d 741,744 (Ala.Civ.App. 2002) (quoting Dunlop Tire Rubber Co. v.Pettus, 623 So.2d 313, 314 (Ala.Civ.App. 1993)); see alsoSlimfold Mfg. Co. v. Martin, 417 So.2d 199, 201-02 (Ala.Civ.App. 1981) (noting that rational mind must be able to trace resultant injury to a proximate cause set in motion by the employment and not otherwise), cert. quashed, 417 So.2d 203 (Ala. 1982). In this case, the trial court could properly have concluded that the worker died because of a workplace fall; however, as we will explain, the mere fact of a workplace fall will not support an award of workers' compensation benefits under Alabama law.
In Slimfold, supra, the worker fell while engaged in a casual conversation in his employer's photocopy room, causing the worker to strike his head on the room's floor and to suffer a massive right subdural hematoma, which created intracranial pressure leading to the death of the worker. The evidence concerning the cause of the fall was inconclusive, but the trial court concluded that the worker's death was compensable although the cause of the fall could not be clearly determined.
Applying the pre-1992 "any-legal-evidence" standard of review to the trial court's judgment, this court reversed, concluding that the accident had not "arisen out of" the pertinent employment. We first acknowledged that certain American jurisdictions had allowed workers' compensation-benefit awards based on a liberal "positional-risk" or "but-for" causation standard,[3] but then noted that a substantial minority of courts had instead "require[d] the claimant to establish a definite causal connection between the work and the fall." 417 So.2d at 201. In concluding that the "definite causal connection" standard prevailed in Alabama, this court derived support, among other sources, from the Alabama Supreme Court's reliance, inWooten v. Roden, 260 Ala. 606, 71 So.2d 802 (1954), upon an Illinois Supreme Court case that had stated: "It is not enough that the injured person may be present at the place of the accident because of his work, unless the injury is the result of some risk of the employment." F. Becker Asphaltum Roofing Co. v.Industrial Comm'n, 333 Ill. 340, 343, 164 N.E. 668, 670 (1928),quoted in Slimfold, 417 So.2d at 201. We held in Slimfold
that because the trial court in that case had found that the cause of the fall was unexplained, that court erred in awarding compensation. *Page 341 
Less than three months ago, in Wal-Mart, this court relied upon Slimfold in reversing a judgment awarding permanent-total-disability benefits under the Act to an cashier who fell and severely injured her hip while attempting to return to her cash register; the cashier testified that she had "just lost [her] balance," that she did not know what had made her fall, and that she could have fallen at home "just as well." 830 So.2d at 742. Although the cashier testified that a tile floor at her place of employment was sometimes slippery, she did not testify that she slipped on the floor, and she did not know whether her accident was caused by the floor. 830 So.2d at 746.
While Slimfold and Wal-Mart involved falls that may be labeled "unexplained," the trial court in this case found that "evidence of a plausible explanation ha[d] been presented," and determined that the worker most likely suffered a fall as a result of "low blood sugar" or "a seizure caused by withdrawal from alcohol." As we have stated, there is evidence to support such a finding, which is equivalent to a finding that the worker fell because of an "idiopathic" factor, i.e., a characteristic peculiar to the individual, such as a preexisting physical weakness or disease. See Ex parte Patterson, 561 So.2d 236
(Ala. 1990). As one noted commentator has stated, "idiopathic fall cases begin with an origin which is admittedly personal and which therefore requires some affirmative employment contribution to offset the prima facie showing of personal origin." 1 Lex K. Larson, Larson's Workers' Compensation Law § 9.01[1] (2001);cf. Brownfield v. Revco D.S., Inc., 612 So.2d 1203
(Ala.Civ.App. 1992) (summary judgment denying workers'-compensation benefits for an injury arising from a worker's placement of his head in a part of a motorized lifting device was supported by undisputed evidence that the worker was subject to seizures and had failed to take anti-seizure medications).
In this case, the trial court determined that an "affirmative employment contribution" was present, stating that "[i]n this case, the [worker] had to climb 100 or more stairs to get out of the mine, a condition not encountered by persons not so employed." Several of the worker's coworkers gave testimony that would support the existence of the quantity of steps found by the trial court; in addition, one of these coworkers, Holmes, testified that some steps were one-half inch taller than the others, and that the steps would occasionally become slippery and retain coal residue.
We need not decide, however, whether a fall on the steps leading out of the lower pocket of the mine could properly be deemed to have arisen out of employment in the mine because of an affirmative employer contribution to such a fall. Although the trial court found that the worker "lost consciousness while climbing the 100 or more stairs leading out of the mine and fell," substantial evidence does not support a finding that the worker fell on the stairs leading out of the lower pocket. As we have noted, Kimbrell followed the worker until he was four flights from completing his climb to the top of the stairs out of the lower pocket, and the worker completed his climb to the top and acknowledged Butler's call to him by turning, waving his hand, and proceeding to the elevator. Neither Kimbrell, who would have witnessed the bulk of the worker's ascent from the lower pocket, nor Butler, whom Kimbrell asked to look out for the worker's arrival at the top pocket, testified to having seen the worker fall, nor does their testimony indicate that the worker showed any effects from a possible unwitnessed fall while climbing the steps. Moreover, once the worker reached Butler's *Page 342 
level of the mine, he had completed climbing steps. We must therefore conclude that the trial court's finding that the worker fell on the stairs leading out of the lower pocket of the mine is unsupported by the evidence.
The lack of substantial evidence indicating that the worker fell while ascending the stairs from the lower pocket to the upper pocket renders the trial court's award of benefits under the Act erroneous. While the worker may have fallen while walking from the point that he left Butler's sight in the upper pocket to the elevator, or while walking from the elevator to the bathhouse where the worker was later found incoherent, there is no evidence tending to show that such a fall would have arisen out of the worker's employment. Stated another way, while a fall while ascending the stairs leading out of the lower pocket could arguably have been the product of an affirmative employer contribution because there was evidence of a potentially hazardous condition on the stairs, there is no evidence that a fall after completing that ascent would have been the product of anything other than factors personal to the worker, such as low blood sugar.
In summary, while we conclude that the trial court correctly determined that the worker suffered an accidental fall in the course of his employment, that court erred in determining that that fall arose out of his employment. We therefore reverse the judgment in favor of Barbara Rubley and Crystal Rubley and remand the cause for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
[1] The trial court certified a supplemental record containing a document filed on October 15, 2001, and labeled "Amended Final Judgment," in which the trial court purported to change the pertinent compensation amounts; however, that "amended" judgment restated the trial court's pertinent factual findings. While there is authority for the proposition that Rule 60(a), Ala. R. Civ. P., allows the correction of errors in calculation at any time after a final judgment is entered (Mickle v. Mickle,334 So.2d 900 (Ala. 1976)), our decision on the merits of the employer's appeal obviates any need to decide whether the trial court's "amended" judgment was proper under Rule 60(a) or whether it was instead an improper substantive amendment during the pendency of an appeal.
[2] While the trial court found that "the [worker] continued to climb stairs until he was out of" the sight of Butler, the record contains no evidence that there were any more steps to climb after reaching the upper pocket of the mine; rather, the evidence shows that access to the upper pocket from the surface was by elevator, as we have discussed.
[3] Such a standard "take[s] the position that the causation requirement is satisfied by the fact that the claimant's employment placed him in the particular place at the particular time when he was injured." 417 So.2d at 201.